## NATIONAL MOTORSHIP CORPORATION v. THE CHESTER et al.

## THE CLEVELANDER.

## THE CHESTER.

### No. A-17386.

District Court, E. D. New York.

June 4, 1946.

Mahar & Mason, of New York City, (Frank C. Mason, of New York City, of counsel), for libellant.

Burlingham, Veeder, Clark & Hupper, of New York City (Frederic Conger, and John P. O'Rourke, Jr., both of New York City, of counsel), for claimant.

GALSTON, District Judge.

The motor vessel Clevelander, on the afternoon of December 25, 1944, was bound from 27th Street, Manhattan, East River, to Edgewater, New Jersey. She had proceeded on the starboard side of the channel without incident until she reached the vicinity of St. George ferry slips. At that time the tug Chester, with a car float on the Chester's port side, was approaching from the opposite direction, rounding the Battery. A collision occurred at about 4 p. m. The contentions of the respective parties are: that as the Clevelander sighted the Chester, the vessels were in position safely to effect a port to port passage; whereas the Chester contends on turning courses that a starboard to starboard passage was indicated.

Much of what occurred, indeed the essential maneuvers of the vessels including a description of their relative positions before collision as well as of the resulting collision, were related by two disinterested witnesses, both attached to the ferryboat Tompkinsville, belonging to the City of New York. The ferryboat was lying in No. 2 ferry slip at the foot of Whitehall Street. Both Captain Hinchey and Captain Parker were in the in-shore pilot house when these vessels were observed. Captain Parker saw the Clevelander first as she was coming down along the ferry slips and when thus first seen by him she was off slip No. 3, about 75 or 80 feet from the extreme end of the ferry rack. So far as he could tell her speed over the ground was about two miles and she was bucking the flood tide. When he first saw the Chester, that tow was going around the end of the Battery in the vicinity of the Ellis Island ferry slip, about 300 feet from the Battery wall. The Chester was then headed in the direction of Brooklyn, crossing the East River, while the Clevelander was coming down the ferry slips, possibly headed for Ellis Island or in that direction. The most important part of his testimony is that as he then saw the two boats, his judgment was that if they had continued on in their respective courses the Clevelander would have passed the stern of the Chester in a port to port passage. However, he heard the Chester, as it rounded clear of the Ellis Island ferry slip, blow two whistles and swing to port. The Clevelander promptly answered with two whistles. These two whistle signals were exchanged when the vessels were about 900 feet apart. At that time, after the Clevelander answered the two whistle signal, she veered in the direction of Governor's Island, i. e. to port. According to Parker, the Chester had swung her car float, which was on her port side, inside the Clevelander, but later the float swung sharply to her starboard and collided with the bow of the Clevelander.

Captain Hinchey, on the Tompkinsville, had observed the Chester first. He did not see the Clevelander until the Chester blew two whistles. At that time, when the Clevelander responded with a two whistle signal, the Chester had swung sharply to port. Hinchey said that when he thus saw the two vessels they could have passed starboard to starboard at the time the whistles

were blown. Then the Chester started to back, when the vessels were about 100 feet apart, and as she backed, her bow and float swung to starboard. He thought the Clevelander also was backing.

The apparent contradiction in the versions give by Parker and Hinchey in respect to how these vessels could have passed each other is explained by the fact that Parker's view covered a longer period than Hinchey's, for Parker, as has been said, saw the Clevelander before he did the Chester and before the vessels exchanged the two whistle signals.

To review the testimony given by Freeman, the master of the Clevelander, and Johnson, his mate, would not add to the description heretofore given of the relative positions and maneuvers of the two vessels, though it might be added that when the Chester blew the three whistle signal, Freeman put his wheel hard right and stopped his starboard engine in order to avoid a head-on collision. DeMars, who attended the survey, was of opinion that the angle of collision was fifteen degrees from starboard to port on the Clevelander, and the damage was about 20 feet from the stem. He judged that there was little headway on either vessel when the collision occurred.

Noble, the master of the Chester, said that he was in the pilot house but he didn't know where his mate nor deckhands were. He said: "Both of them are supposed to be on deck. I don't know just where they were." Noble said that when he first saw the Clevelander she was well out in the middle, about five or six hundred feet off the ferry rack. This version I cannot accept in the light of the testimony not only of Freeman and Johnson of the Clevelander, but more particularly of the disinterested witnesses Hinchey and Parker. His own position he placed at 300 feet off the Battery wall and, of course, if those had been the relative positions of the vessels, his two whistle signal would be understandable. Burr, the deckhand, added nothing of importance, nor did the second deckhand.

The evidence sustains the claim of the libellant. The Chester, without a lookout, was proceeding too close to the New York shore, and apparently attempted an unwarranted starboard to starboard passage. The subsequent maneuvering in changing course also contributed to the collision.

The libellant may have a decree in the usual form.

Concurrently herewith appropriate findings of fact and conclusions of law will be filed.